Our next case is Coral Wireless Licensing v. Apple Inc. Mr. Mueller, you reserve three minutes of your time before we vote. Yes, Your Honor. All right. Just wait just a little bit.  Thank you, Your Honor. May it please the Court, my name is Joe Mueller, and I represent, along with my partner, Richard O'Neill, Apple. With Your Honor's permission, I'd prefer to start with the 151 patent and then turn to the 536 patent. With the 151 patent, there are three grounds on which we believe the judgment below cannot stand. First, with respect to infringement, there was a failure of proof with respect to elements of the Claim 14 as construed by the Court below. Second, for invalidity, under at least the logic of the infringement theory as presented by Coral Wireless, the claim would be invalid. If that logic were applicable in a way that Coral Wireless argued with respect to Apple's products, the claim would be invalid in light of the prior art. And third, as a matter of enforceability, Coral Wireless's predecessor, Nokia, the previous owner of the patent, breached a duty to disclose the patent application in a timely fashion before Etsy. Those are the three grounds on which we believe the judgment cannot stand, three independent grounds. I'll start with non-infringement. With respect to non-infringement, the claim requires that the mobile station, in this case the accused iPhones, receive a timing advance value one time per multi-frame structure. A multi-frame structure is a unit of time. It's a term of art in the context of GPRS, which is a cellular standard. Multi-frame structure refers to eight multi-frames, which are in turn comprised of 52 TDMA frames, which are in turn comprised of eight time slots. So it's a concatenation of time slots. And the court construed, after argument by both sides, that the claim required sending a timing advance value one time per multi-frame structure. So for each multi-frame structure, one time a timing advance value would be provided. And the claim requires explicitly that devices must be configured to receive this multi-frame or the timing advance value one time per multi-frame structure. So that's the claim requirement. For the purposes of this appeal, at least, can we assume that this multi, this one time thing is consistent with the continuous phase, the continuous operation? Would we agree that one time is met by continuous? No. We don't agree with that. But there's a threshold problem. Unless there's, I mean, it seems that that's what the jury, that was what was argued to the jury. And there seems like there's substantial evidence for it. I know you don't agree, but you didn't seem to challenge that as error on appeal. Well, we did challenge it. I just want to start as a basis. Yeah. Sure. And I'm happy to start wherever you want. I mean, it's not worth quibbling over things that you're not going to win. Sure. Well, yeah. Let me make sure I understand. Because this comes as a surprise to me. I thought your position was this has three modes that it can act in. It can act in continuous, it can act in initial, and it can act in on-demand. And because on-demand and initial are additional messages that are sent, TAVs that are sent, there's not one. But isn't it the case that if all that the base station and the mobile station were equipped and configured to do was continuous, that that would be a one communication? No. Okay. In that case, I mean, we just— Okay. Well, that surprises me. Sure. And I misunderstood your argument then. No. And there's two basic problems with the— Did you make this— Did you make this argument in your brief? We did make this argument in our briefs. In fact, I don't have any of the page numbers for you, Your Honors. But what we point out in the briefs is that even in the continuous mode, the timing advance value is sent four times. And the— Well, okay. Okay. Okay. I understand. Yeah. The four as opposed to the one. Yeah. But if it's only—if it's configured—if the Apple phone is configured to receive the one and act on the one, that would be sufficient, I take it, that even regardless of whether the base station is sending it additional ones for redundancy? Well, what I— The additional messages are just redundancy, right? In case the phone has not picked up the first one? Sure. I mean, if I could just perhaps step back and I'll try to answer Your Honor's question. So the system that actually exists—and there is no dispute on how the products actually work. There's no dispute that the products have one mode. And in that one mode, they're capable of, at all times, receiving timing advance values pursuant to three procedures—initial, on-demand, and continuous. There was no dispute on that. The Apple iPhones are always configured to receive timing advance values in any time slot within a multi-frame structure—one, two, 250. They are always equipped to do that, always configured to do that. I think what Your Honor is asking is, in the instance where— In the continuous, where four messages are sent. In the continuous, where the four messages are sent, there's still two basic reasons why the products would not infringe. The first is they're still configured to receive timing advance values at any time. They're never in only continuous mode. They're always in a mode that allows for the receipt of timing advance values at any moment in time, at any time slot. They're simply not configured to do continuous only. That is never a mode that they enter. They're always in a mode that allows for timing advance values as many times as they might be sent. The second problem with the theory is, even in the continuous mode, the facts are undisputed that the timing advance values are sent four times. The argument made to the district court is that that nonetheless met the one-time requirement because the products don't receive the timing advance value until it's fully decoded and used. But again, the testimony was clear that they do hit the antenna, they're subject to analog to digital processing, they go to the baseband circuit, they are received in a real sense. And received in a sense that matters for the invention because the alleged invention here is to reduce the number of time slots expended by timing advance value operations. That allows the base station to use other time slots for communications to other phones, and it also allows the phones to not spend as much time listening for timing advance values. And we cited these sections of the specification in the briefing, but as one example, the patent talks about how under the approach of the patent, the number of slots to which a mobile station must listen for timing advance values is also reduced. That doesn't happen in the Apple products. They're always listening for timing advance values pursuant to any of the procedures. They are never in a mode where they will only be equipped, configured to receive one timing advance value. They are in fact the opposite of the claimed approach. Can I move you to the question of implied waiver or inequitable activity? Suppose you have a case in which there is a clear breach of the obligation by the participant in a standard setting organization to reveal an application or a patent, and nonetheless, the standard setting organization goes ahead, but they pick a completely different program. So there's clearly a breach, but the breach does not result in having the patent incorporated within the standard. Do you think nonetheless that that's actionable, an actionable breach? It might be that there's no case for controversy if, for example, there was no patent claim. Suppose there is another patent claim, but it isn't directed to the particular standard. It's some poor guy out there who's doing something other than under the standard, and he gets sued. Can he come in and say there was a breach of the obligation to the standard setting organization, and it may not have had the consequences for which the rule was established, but nonetheless, it was a breach, and it has consequences for me, therefore, you should throw the patent out. What would you do? I'd say two things, Your Honor. These types of claims can be brought, and I have litigated cases in which they have been brought as breach of contract. So it's conceivable, then, the facts you're describing, the party who feels aggrieved by the breach could bring a breach of contract action to try to hold accountable the party that's not. That's not what we've got here. But I think in an implied waiver situation like we have here, it's difficult to envision how it might come to a court in the absence of an assertion of that same technology as standard essential, which is exactly what happened here. The 151 patent was asserted from the complaint onward as standard essential. There was some attempt to move off that at trial, but if you look at the complaint in the joint appendix, including, Your Honor, at research 05. So when you say standard essential, the organization selected Erickson's plan and not Nokia's, I take it. Now, are you saying that nonetheless, the 151 was effectively incorporated in the standards plan? Well, that's their argument. I mean, I think our threshold argument is it wasn't, and there's no infringement because the approach that was actually selected is different. So assuming infringement, you would say, well, so my hypothetical doesn't apply because there was a consequence, which is that we're here. In fact, at trial, they argue that the Erickson proposal had effectively co-opted their technology and that it was incorporated into the standard. This is exactly what the rules are intended to prevent, where a party sits on a patent application for years, four years after this section of the standard was adopted, surfaces later and asserts the patent as standard essential. And the various reasons relied on by the district court for not finding unenforceability simply don't square with the plain language of the policy. The policy itself says you're required to disclose applications, not just patents, but applications that might be essential if a proposal were adopted. So it's not just actual essentiality that's a touchstone. It might be essential if the proposal were adopted. And as our expert, who is the former chairman of the Board of Etsy, testified, the purpose behind that is to ensure that choices with respect to technical proposals are made with eyes wide open, that the various participants and working groups understand what parties are applying for in terms of coverage and protection on the proposals being made to the organization, so they can decide with eyes wide open as to who holds which rights, which proposal to adopt. What happened here is exactly what the rules were intended to prevent. A party makes a proposal, has an application pending, doesn't reveal it for years, four years after the section was frozen, and five years after the proposal were made. And if the defense says, well, our proposal was rejected, but our idea got in through someone else's proposal that we knew about, that's not a defense. It still shows knowledge of the assertion of essentiality. And here we sit, subject to a claim of infringement based on using the standard. Well, if that's the type of claim you're trying to develop, that's the type of right you're trying to acquire, you need to let the standard setting organization know. It's exactly what the rules require, being clear and transparent about what rights you have in application form and in actual patent form. And that just didn't happen here. So we do think the unenforceability decision was wrong, in that it was an error of law in misreading the plain and unambiguous terms of the SEIPR policy. And we think it's a damaging precedent going forward, not to make clear, but the rules mean what they say. And that if you're required to disclose applications that might be essential if a proposal is adopted, that necessarily means- Can you help me with the timeline of the facts here? Sure. They didn't disclose the application. Did they ultimately disclose the patent? Yes, in 2002. And was that before or after the standard was adopted? Four years after the standard was adopted. That's exactly right. And the NCI- It was too late at that point for anyone to do anything. Too late for anyone to do anything. It was four years after the standard was frozen. And if the defense is- and one of the arguments that the district court relied on is that the contours of the patent right weren't fully known until the patent was issued. Well, that doesn't, again, square with the policy. The policy refers to applications. And by definition, applications are not final. And the manifest purpose of that term, application, as confirmed by our expert, the former chairman of the board of the organization, was to be upfront and transparent, even with respect to applications. They might change over time, but you need to let the organization know you have an application on file that relates to the technology that might be essential if the proposal were required. If I might turn to the 536 patent briefly. In the 536 patent, again, we believe there's a failure proof with respect to the construed terms. The terms require a binary good state, bad state system. The actual technology at issue is a more sophisticated and different eight-state system. One point I'd like to focus the court's attention on, if I could in my remaining time, is actually an evidentiary ruling, which we think rests on an error of law, where testimony from the named inventor of the patent, as well as testimony from the engineer at Qualcomm who designed the chips, was excluded because the engineer and the inventor used the word state. And the word state also appears in the claims. And the district court took the view that it would be too confusing for the jury to hear testimony in which a word, state, appeared that also appears in the claims. It would be tantamount to some form of expert opinion or the like, akin to what this court dealt with in the Cordes case, where an inventor was asked about an accused infringing product. It's not what the testimony was. It was percipient testimony by witnesses who worked on, respectively, the chip at issue and who worked on the patent and the technology that gave rise to the patent. And they were offering fact testimony. The fact that they used the word state, which is a term in the computer field referring to state machines and many different contexts in the computer field, is of no moment and should not have been allowed to be the basis for exclusion of that testimony. And it was highly prejudicial to Apple insofar as it deprived the jury of hearing from the inventor and the Qualcomm engineer with respect to key facts that related to our non-infringement defenses. And again, if the rule is going to be that any time a fact witness uses a claim term, their testimony is excluded, that's going to have a distorting effect on patent cases. And so we think at a minimum because of that, there needs to be a vacatur of the 536 decision and a retrial with the full set of evidence. We actually think we'd go further because we think as a matter of law, there's a failure of proof. But at a bare minimum, a testimony should not have been excluded and it was an error of law to do so. Thank you, Your Honor. Mr. Finster. May it please the Court. The Court should affirm the judgment because substantial evidence supports the jury's verdict in all respects and because the District Court did not abuse its discretion in making its findings on the implied waiver. If the Court pleases, I'll start first with the 151. On the 151 infringement, the evidence supports the jury's verdict that operating in continuous mode, the accused products meet the claim element of receiving the TAM, the TAV, once per multi-frame. There was extensive evidence in the source code and in the expert testimony of Dr. Wessel that the accused products work in continuous mode. In continuous mode, they are specifically programmed in their source code to receive the TAV once per multi-frame structure and to use that same TAV for both the uplink and downlink channels even when the base station sends separate TAVs for both the uplink and downlink channels. The evidence was, contrary to what my friend just said, the evidence was that the actual adopted standard did not adopt the 151 making it essential but rather Erickson's proposal gave it the option. The actual standard and the evidence is replete in the record that the standard gives the base station the option to use separate TAVs for the uplink and downlink and gives the mobile station the option to use one or both. The source code then shows that the accused products was specifically programmed, not by happenstance, not merely capable, but specifically configured to and intentionally designed to only receive the TAV once per multi-frame structure and to use that TAV for both the uplink and downlink channels just as the 151 requires. And your answer to the argument Mr. Mueller makes about the four signals as opposed to the one is, it goes to the word receive, you say that it ignores three of the signals even though they are sent and even though they may have been, they may hit the antenna but it doesn't pay any attention to them once it's picked up the signals. The jury heard conflicting testimony from this but Dr. Wessel testified expressly that one, the claim requires not receipt of the TAM, the timing advance message, but rather the timing advance value, that the timing advance value is an 8-bit integer value and that that 8-bit integer value, the TAV does not appear in the TAMs, the four timing advance messages, and that the source code only decodes that TAV to receive the 8-bit integer one time. And he went through that... Well, I'm not sure I understood what you just said. Sure. Are you saying that the TAM, the TAM is sent four times? Correct. Right. Are you saying that each of the four does not contain the requisite bits to transmit the TAV? That is correct. Dr. Wessel testified... One of the other three TAV, only the first contains that? No, no, no. The TAM is, the timing advance message contains a convolutionally encoded version of the TAV. Right, but it still contains the TAV. No, actually it doesn't. The testimony in the record was that the 8-bit integer itself, because it's convolutionally encoded, the 8-bit integer does not actually appear in that timing advance message. The information is sufficient to receive it. If the message is sent in Russian and it's later translated into English, it's still a message, it's still the same message, it just happens to be in a different language. What you're saying is the convolutionally encoded message is still the TAV, right? It just doesn't happen to have the exact bit numbers that the ultimate encoded TAV does, right? The testimony in the record was that the timing advance message contains information sufficient for the receiver to decode and receive the TAV, but that the actual 8-bit integer itself, the TAV, is not itself as an 8-bit integer in the timing advance messages, and that the system only receives it one time. He went through the source code and showed the if-then statement and testified that... Well, I understand your argument about receipt. Just what confused me was that you were saying, I think, that the TAMs did not contain the TAV. And realistically, they do contain it, right? It's just in an encoded form. Isn't that right? It is encoded and it is received in an encoded form, but Dr. Wessel did testify and actually went through this in the record that that 8-bit integer is not itself in the timing advance message. And so... I understand that. It wasn't in English. It was in Russian when it was sent. That's right, but... It was translated into English. So the question then still comes back to when was it received, whether in the Russian version or the English version. And your argument is that it wasn't received until it was translated into English. Well, it's not just my argument, but the evidence supports the jury's determination. We have to assume that that's what the jury so found. With regard to the other operating modes, I think it can't really be disputed that there is substantial evidence to support the jury's determination that in continuous mode, the TAV is received one time, drawing all inferences in favor of core wireless as we must. So the next question is, does the fact that it can receive this on-demand signal negate infringement? It does not. The continuous mode is the only mandatory mode. That's in DX170. It appears in the record at 9862. Continuous mode is mandatory. The evidence is that the on-demand and initial modes are optional. Moreover, Dr. Wessel testified that the continuous mode is sufficient as long as the mobile station is moving less than 600 miles an hour. He testified, this is at appendix 1428 to 1429, that it would be a huge waste of resources to send another timing advance message to a mobile that's running the continuous timing advance process. And at 2026, Dr. Knightley admitted that there is no evidence that the on-demand was ever used. And so the jury was sufficient, had substantial evidence that was sufficient to warrant the jury's conclusion that the continuous mode is a normal operating mode, that the on-demand is rarely if ever used, and that the accused products are configured to receive the timing advance value one time for multi-frame structure in continuous mode, which is a normal operating mode, and therefore infringes the 155. Can I ask you about the 536? Yes. Specifically with respect to the definition and the claim construction of bad state and applying that to the speech degraded category. Yes. In the accused device. The bad state is defined as state flagging that the frame does not contain error-free user information. Now, your witnesses testified that speech degraded was a bad state. But if I understand speech degraded, that does not necessarily mean that there is, that the frame does not contain error-free user information. Isn't that right? No, Your Honor. The testimony in the record was that Dr. Wessel testified expressly that the speech degraded is treated by the system as a bad frame. And I'll point you to 284. The system is different from how it, whether the flag indicates what it contains. That was sort of the whole point of the claim construction, wasn't it? Because you had asked for a claim construction more in the nature of how the system treats it. Speech degraded flag. Dr. Wessel's testimony was that speech degraded flags that frame for the system as a bad frame. And he testifies at 2284. I think in this table it sounds nuanced, but in the device it's not nuanced at all. When it receives a speech degraded frame, that frame is substituted and muted. The receiver treats it like it does not contain error-free user information. If the receiver thought it contained error-free user information, it would use it. Dr. Wessel's testimony was unequivocal on this, that each one of the RX types flag that frame as either containing error-free user information or not containing error-free user information, then the RX DTX handler so treats it. And bad frames are substituted and muted. And that was the evidence presented to the jury, drawing all inferences in favor of the verdict. We have to assume that the jury credited that testimony over Dr. Burer's, I think it was. If there are no other questions on 536, I'll just move briefly to the waiver issue. The district court did not abuse its discretion or make any findings of error, clear error. Let me ask you on 536 real quickly. You may have a one-sentence answer, but why is the RATCH marker not a code word? Dr. Wessel testified that the RATCH ID is not a code word that delineates the 35-bit message. Why? Okay, so he testifies at 1509 to 1510 that the RATCH ID doesn't delineate the start or end of the message. It doesn't indicate where the message occurs, and it doesn't even indicate definitively for the system that the frame even contains a message. Rather, it has to go through this two-step process of going to the second step. Once it determines that there's no data, then it goes and does a CRC check to see if the 35-bit pattern matches the predefined 35-bit pattern. And only then does it determine that the frame contains a message. His testimony is at 1509 to 1510, at 1558, and at 2186 to 2190. Turning now briefly to the waiver argument. First, there was no evidence that the 151 patent was essential. In fact, the evidence was that the 151 patent was made optional in the standard, that you can practice the standard without performing the 151 patent, and therefore it's not required to be disclosed at all. Moreover, the district court found, and was justified in so finding, that there was no duty to disclose because, one, it wasn't essential, two, there was no essential IPR. There hadn't been any patent rights applied yet. The only application that existed as of the freeze date of June 1998 was a Finnish application. The evidence in the record is that that was confidential, and the confidential information is expressly excluded from the definition of essential IPR. In fact, the 151 patent wasn't even applied for in the U.S. until November 1998, after the date, and it didn't become allowed until June 2002, and it was disclosed July 2002, right after. What's the provision that excludes confidential information from the IPR? You don't have to give me chapter and verse, just give me the gist of it. It's the definition of essential IPR, and essential IPR, the evidence in the record is that the definition of essential IPR excludes confidential material, and the evidence further is that the application at the time of the freeze date, up through the freeze date, which is the relevant time for disclosure, was confidential. These were Finnish applications, and under Finnish law, which I know nothing about, but the evidence in the record was that under Finnish law, these applications were considered confidential. Confidential being in the sense that it was the right of the applicant not to have them disclosed, presumably either by the Finnish office or by anyone with knowledge of the application, but that doesn't mean that the possessor of the application wouldn't have a right to disclose, or couldn't be required to disclose by the body that's the standard setting operation. I disagree with the last statement. Why? Because there's a duty to disclose that's defined by the existing standards. But depending, I mean, the standard setting operation could have said, we don't care if it's confidential or not, we want to see it. There would have been an obligation to waive confidentiality by the applicant in that situation. Wouldn't you agree? In that situation, I agree, but that's not the situation here. You're pinning this entirely on the definition of what is required as being excluding confidential material. Only with respect to confidential, but that there was no duty to disclose. The court's finding was well supported. It wasn't essential. It was confidential. It wasn't an actual IPR right at that time and didn't become so until 2002. I think there's a lot of reasons there. The jury heard conflicting testimony, but it heard substantial testimony in support of every one of the points that we needed to make for infringement. This was a good trial. We laid out exactly the evidence. The jury heard the evidence and conflicting testimony as to why the accused products meet the 151 patent, why they were specifically programmed in their source code to receive the TAB once, and why they meet the two-step interpretation process of the 536. The jury was well supported in its finding that there was no invalidity, and we asked the court to affirm. Thank you. Mr. Muir, I'm going to put you back for three minutes. Thank you, Your Honor. Several points, Your Honors. First, your question on the continuous mode and whether the timing advance value is in each instance of the four. It is. It is in each instance of the four. There was no dispute on that. The argument made below by the expert for Core Wireless was that the decoding process meant that it wasn't fully received until the processing had occurred and there was reliance on it. But the TAB was, without question, within each of the four instances. Albeit in an encoded or encrypted form. Correct. That's exactly right. Related to that, for the invalidity defense that we presented, the continuous procedure was part of the prior art. And that's the argument that we made, that if continuous somehow met the claim, the continuous procedure was in a prior proposal to Etsy that said Appendix 9907 describing the continuous procedure. And that was the argument our expert made, is that if this somehow satisfied the claim, it'd be invalid in light of the prior art teaching that same continuous procedure. Second point. Mr. Fenster emphasized that these procedures, on-demand timing, on-demand initial, and continuous are optional. And that's true from the perspective of the base station. And if I could respectfully direct your honors to Joint Appendix page 2276. This is a question and answer with Core Wireless's expert when I was cross-examining him. Question, sir, we've heard argument in this case that the base station has the option of using these three procedures, right? Answer, absolutely, yeah. Question, but you understand that from the mobile station, the phone's perspective, it is absolutely mandatory that they perform all three, correct? Answer, yeah, that's right. Question, and that is, in fact, how the Apple products are configured to operate. They're configured to do all three. Answer, yes, that's right. And that's the basic failure here. We have phones that are configured to receive timing advance values at any point in time, any point in time within a multi-frame structure, one, two, three, four, seven, 250 times, and a claim that requires being configured to receive a timing advance value once. It's the exact opposite of the claimed approach. So we think that that testimony shows that the optionality is on the base station side, not the mobile side. And that segues into my third point, which is the unenforceability issue. This is a mandatory part of the standard for the phone. And now the argument is, well, this is not really a standard essential patent. The complaint says explicitly, and it's, I think, at 3006, but the complaint is in the joint appendix. It characterizes these as standard essential patents, including the 151. It's the contention the whole way through the case, and the reliance for their infringement theory is on the standard and what the standard makes mandatory. Well, if that's the type of theory you want to advance, then you have to play by the rules in front of the standard setting organization. And to Your Honor's question on confidential information, this is the definition. IPR is defined, and this is at Appendix 9657, to mean any intellectual property right conferred by statute law, including applications thereof, other than trademarks. For the avoidance of doubt, rights relating to get-up, confidential information, trade secrets, and the like, are excluded from the definition of IPR. It is clear on the face of that procedure that applications were meant to be disclosed. And as the chairman of the board testified at trial, the references to confidential information and trade secrets and so on relate to other forms of intellectual property. Moreover, the idea in the patent application was proposed by Nokia to the standard setting organization. There's no way to maintain confidentiality over an idea they proposed to the organization. It wasn't a confidential idea. What they kept confidential, improperly, was the existence of a patent application. And it would be a highly damaging precedent for standard setting organizations going forward to permit a party to do exactly what these rules were intended to prevent, to keep your patent rights secret for years and years and years, and then later allege that they're standard essential. The final points I'll make, Your Honor, is on the 536 patent, you're exactly right, Judge Bryson, on both the speech degraded. It's not flagged as good state or bad state. It's an intermediate state. It could be good or it could be bad. And it's a function of the eight-state system being more nuanced and just different in kind from the binary two-state approach claimed by the patent. Well, what do you say to the argument that Mr. Fenster makes about the fact that the Apple phone flags the speech degraded as in the same way that it would flag bad speech? It doesn't flag it in that way. It uses it, as Your Honor pointed out. I mean, the verb that is the weasel, if I may, the verb that is floating around here is the verb treat. And I've, I've, I've. That's right. That's exactly right. And this was the argument made by Core Wireless at Markman, as Your Honor pointed out, referring to downstream use as the touchstone. And Judge Graywall rejected that argument and said, no, there has to be something about the frame itself that tells you what it is. And it needs to tell you if it's a good state or a bad state. And they're trying to shoehorn this eight-state system into this binary paradigm. And this just doesn't fit. The speech degraded could be good, could be bad. You don't know by looking at the frame itself. The fact that downstream it's treated the same is irrelevant, is irrelevant. And the final point, Your Honor, is on the bit word, bit pattern, you're exactly right. The RATCH marker always denotes where the RATCH code occurs. In fact, it's a set number of bits after the marker comes, after the word comes, the message comes. Without exception. Without exception. And that's different from what the patentee claimed. In fact, they disclaimed that approach. Thank you. Thank you. That concludes our argument for this morning. This Court now stands in recess. All rise. The Honorable Court has adjourned until tomorrow morning at 3 a.m.